IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ARTHUR G. THORNE IV,　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　)　　　NO. 3:23-cv-00619
v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)　　　JUDGE RICHARDSON
SATELLOGIC USA, INC.,　　　　　)
　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　)

## MEMORANDUM OPINION

On June 16, 2023, Plaintiff Arthur G. Thorne IV ("Plaintiff") initiated this lawsuit against

Defendant Satellogic USA, Inc. ("Defendant") by filing the Complaint (Doc. No. 1) asserting

breach of contract as the sole cause of action.[1] Pending before the Court is "Defendant's Motion

to Dismiss for Failure to State a Claim" (Doc. No. 13, "Motion") filed pursuant to Fed. R. Civ. P.

12(b)(6).[2] Plaintiff filed a response in opposition (Doc. No. 16, "Response"), to which Defendant

filed a reply (Doc. No. 17, "Reply").

For the reasons stated herein, the Motion will be DENIED.

---

[1] Plaintiff is to be commended for focusing on what he evidently has concluded is his best legal theory for recovery and, relatedly, for not doing what is done far too often: attempting to turn an alleged breach of contract into also umpteen different kinds of torts and breach-of-contract alternatives (such as promissory estoppel). This tailored (as opposed to kitchen-sink) approach saves everyone involved (the parties, counsel, and the Court) substantial resources in the course of this litigation.

[2] Included in the Motion is a memorandum of law in support of the motion. The Court must admonish counsel that this approach—not making the supporting memorandum of law a separately filed document—runs contrary to this Court's Local Rule 7.01(a)(2) and should be avoided in the future lest the Court ultimately reject the filing (which, this time at least, the Court will not do). Both the Motion and the memorandum included therein are referred to herein as "Motion."

<u>FACTUAL ALLEGATIONS</u>[3]

In early 2021, Defendant, a satellite services company, decided to begin selling a product called a Dedicated Satellite Constellation ("DSC") to foreign governments. (Doc. No. 1 at ¶¶ 5-6).[4] On or around May 26, 2021, Defendant offered Plaintiff a position as Senior Sales Manager, a role that would primarily involve attempting to develop and procure a customer base for the new product (DSCs). (*Id*. at ¶¶ 7-8). Because there was no history of sales for the DSCs, Defendant offered Plaintiff a low base salary with commissions of up to 15% (plus potential bonuses) for making sales of DSCs. (*Id*. at ¶¶ 10-11). The offer included no cap on the amount of commissions that Plaintiff could earn. (*Id*. at ¶ 11). In reliance on Defendant's representations regarding this compensation, Plaintiff agreed to work for Defendant. (*Id*. at ¶ 12). Though the parties engaged in discussions leading up to the offer, Plaintiff executed an offer letter (Doc. No. 13-1 at 4-5, "Offer Letter") reflecting the above-referenced terms on July 6, 2021. Also attached to the Offer Letter was a Commission Plan (Doc. No. 13-1 at 8, "Commission Plan") outlining Plaintiff's commission-based compensation structure.[5]

---

[3] The facts herein are taken from the Complaint at Doc. No. 1. For purposes of the instant Motion, the facts in the Complaint are accepted as true, except to the extent that they are qualified herein (as for example by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

[4] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. When citing to the Complaint, however, the Court endeavors to cite to the specific paragraph of the Complaint, rather than the page number.

[5] For reasons unknown to the Court, Plaintiff did not attach the Offer Letter or Commission Plan to the Complaint. Defendant, however, attached both to the Motion. (*See* Doc. No. 13-1). The Sixth Circuit has noted that a district court "may consider a document not formally incorporated by reference in a complaint when the complaint refers to the document and the document is central to the claims." *Nixon v. Wilmington Tr. Co.*, 543 F.3d 354, 357, n.2 (6th Cir. 2008) (citing *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514

In his role as Senior Sales Manager for Defendant, one of Plaintiff's primary tasks was to help obtain a $6 million contract for the sale of DSCs to the Albanian government. (Doc. No. 1 at ¶ 14). Over the course of many months working on this project, Plaintiff organized and made multiple visits to Albania, personally met with members of the Albanian government, up to and including the Prime Minister of Albania, and was the primary person responsible for presenting Defendant's services to Albanian government officials. (*Id.* at ¶¶ 15-18). Plaintiff also developed and maintained personal relationships with Albanian government officials and was heavily involved in negotiating Defendant's contract with the Albanian government by attending meetings and providing additional briefings to Albanian officials. (*Id.* at ¶¶ 19-20). These negotiations would not have been possible or successful without Plaintiff's efforts. (*Id.* at ¶ 21). Throughout the negotiation process, Defendant repeatedly assured Plaintiff that he was "the lead" on this deal[6] and that he would receive his contracted commission when the deal was signed. (*Id.* at ¶ 22).

In approximately March 2022, the Albanian government agreed, in principle, to terms with Defendant regarding the purchase of DSCs. (*Id.* at ¶ 23). By June 2022, all necessary documents to complete the deal were submitted and awaiting execution by the Albanian government. (*Id.* at ¶ 24). At that point, "the job was effectively done" and Plaintiff had "completed all work necessary to earn his commission."[7] (*Id.* at ¶ 25). However, the need to meet certain legal prerequisites and

---

(6th Cir. 1999)). Here, Plaintiff makes no objections to the Court considering these documents for purposes of deciding the instant Motion. In fact, in his Response, Plaintiff acknowledged that the Offer Letter and Commission Plan were "clearly identified and accurately described in the Complaint," and are the "contractual documents at issue." (Doc. No. 16 at 7). Accordingly, even though they were not attached to the Complaint, the Court treats the Offer Letter and Commission Plan as forming the basis for Plaintiff's breach-of-contract claim and will consider them in deciding the Motion.

[6] Herein, "the deal" refers to the agreement (sought and eventually obtained by Defendant) between Defendant and the Albanian government for the purchase of DSCs.

[7] The Court accepts these allegations as true, but only with some (interrelated) observations about the (limited) effect of such acceptance. First, the precise upshot of these alleged facts is somewhat unclear;

complete formal applications would delay formal execution of the deal for another several months.[8] (*Id*. at ¶¶ 23, 27).

To avoid paying Plaintiff commission for the deal, Defendant terminated Plaintiff on July 22, 2022, only months before the deal officially closed.[9] (*Id*. at ¶ 26). Plaintiff's termination was made without cause,[10] as he never received any prior discipline or warnings for poor performance or misconduct. (*Id*. at ¶ 27). In September 2022, just months after terminating Plaintiff, Defendant publicly announced that it had formally signed the deal—worth $6 million—with the Albanian government. (*Id*. at ¶¶ 28-29). However, Defendant did not pay Plaintiff any commission for the deal before or after his termination, and Defendant maintains that it does not owe Plaintiff any commission for the deal. (*Id*. at ¶ 29).

<u>PLAINTIFF'S CLAIMS</u>

On June 16, 2023, Plaintiff initiated this lawsuit against Defendant by filing the Complaint (Doc. No. 1) in which he asserts (only) a single claim of breach of contract. (*See id*.). Via the

---

there is some ambiguity as to what it means for a "job" to "effectively" be "done" and what it means for a commission to be "earned." Second, the Court does not treat these allegations as establishing Plaintiff's claim as a matter of law; the Court can see a distinction between saying that "the job was effectively done" and that "all work necessary [for Plaintiff] to earn his commission [had been completed]," and saying that a contractual obligation for Defendant to pay Plaintiff a commission had been triggered. So the Court treats these facts as making the point that in general terms Plaintiff had done substantial work and had advanced the putative deal to where the Albanian government was on the verge of executing the contract Plaintiff had been working to secure.

[8] The Complaint does not state the precise date on which the deal was finalized. However, the Complaint does state that Plaintiff was terminated on July 22, 2022, "mere months before the deal officially closed," (*id*. at ¶ 26), and that Defendant publicly announced the deal in September 2022. (*Id*. at ¶ 28). The Court infers from this that the deal was executed sometime in August or September 2022.

[9] Without purporting to state exactly what Plaintiff means when he uses the phrase "officially closed," in this context, for now the Court interprets this to mean that the deal (i.e., the agreement to purchase DSCs) was formally signed by the customer (in this case, the Albanian government).

[10] Plaintiff does not assert that he could be terminated only for "cause." Rather, Plaintiff concedes that any employment relationship that he had with Defendant was at will. (Doc. No. 16 at 9–10).

lawsuit, Plaintiff asserts that he had an enforceable contract with Defendant entitling him to commission for the deal he helped Defendant secure with the Albanian government. (*Id*. at ¶ 32). Plaintiff claims that he performed his obligations under the contract and that Defendant breached the contract and violated the implied covenant of good faith and fair dealing by failing to pay Plaintiff the commission to which Plaintiff claims he was entitled. (*Id*. at ¶¶ 34–35). Plaintiff seeks damages of no less than $865,000 for "earned but unpaid commission." (*Id*. at ¶ 36, Prayer for Relief).

<u>LEGAL STANDARD</u>

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.,* 219 F.Supp.3d 645, 652–53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791–92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir. 2008). To put it only slightly differently, "[a] Rule 12(b)(6) movant 'has the burden to show that the plaintiff failed to state a claim for relief.'" *Willman v. Att'y Gen. of United States*, 972 F.3d 819, 822 (6th Cir. 2020) (quoting *Coley v. Lucas Cnty*., 799 F.3d 530, 537 (6th Cir. 2015)).That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable

matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

DISCUSSION

Plaintiff's sole cause of action is for breach of contract. Under Tennessee law,[11] the elements of a breach-of-contract claim include "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *C & W Assets Acquisition LLC v. Oggs*, 230 S.W. 3d 671, 676–77 (Tenn. Ct. App. 2007).[12]

Defendant challenges Plaintiff's breach-of-contract claim on several grounds. First, Defendant argues that the Complaint fails to establish the existence of an enforceable contract because (according to Defendant) the Complaint does not identify a particular contract. Second, Defendant argues that the Complaint fails to allege a sufficiently definite promise to create an enforceable contract. Third, Defendant asserts that the Complaint fails to allege facts establishing

---

[11] The parties agree that Tennessee law governs Plaintiff's sole (breach-of-contract) claim.

[12] The Sixth Circuit has explained:

> In diversity cases such as this, we apply state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. *See id.* "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state] Supreme Court would decide otherwise." *Kingsley Assoc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir.1995).

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citation omitted). Herein, when the Court cites a decision of the Tennessee Court of Appeals, it does so with confidence that the State Supreme Court today would not decide differently with respect to the cited proposition(s).

that Defendant breached the contract. Finally, Defendant argues that the Offer Letter forecloses any breach-of-contract claim because it specifically states that it is not an enforceable contract. For the reasons discussed herein, the Court rejects each of these arguments.

A. Plaintiff Has Identified A Particular Contract Defendant Allegedly Entered Into and Breached.

Defendant first argues that Plaintiff's breach-of-contract claim fails because (according to Defendant) the Complaint does not identify a specific contract that exists between the parties. (Doc. No. 13 at 7). However, as noted above, Plaintiff explains in his Response that the Offer Letter and its attachments (i.e., the Commission Plan), "which were clearly identified and accurately described in the Complaint," are the "contractual documents at issue." (Doc. No. 16 at 7).[13] Accordingly, construing the allegations of the Complaint in favor of Plaintiff as required on the instant Motion, the Court finds that Plaintiff has adequately identified the nature or substance of the particular alleged contract that forms the basis for Plaintiff's breach-of-contract claim.[14] Thus, the Court declines to grant the Motion based on this argument, even though it well understands that Plaintiff potentially may be unable ultimately to establish that the parties actually entered into this alleged contract.

---

[13] In addition, the Complaint cites "discussions leading up to the offer" as framing the terms of the contract to which the parties agreed. (Doc. No. 1 at ¶ 8). Tennessee courts have long held that contracts for commission may be enforceable whether the contract is oral or written. See *Mande Realty v. Deerhead Resort, Inc.*, No. 87-9-II, 1988 WL 5694, at *2 (Tenn. Ct. App. Jan. 29, 1988) (internal citation omitted); *Crye-Leike, Inc. v. Carver*, 415 S.W.3d 808, 819 (Tenn. Ct. App. 2011). Although Plaintiff does not appear to purport that his breach-of-contract claim is based on an oral contract arising from these discussions, rather than the Offer Letter and Commission Plan, these discussions may prove to be relevant parol evidence to help in the construction of the terms of the written contract.

[14] Helpfully, Plaintiff makes clear that the Complaint in no way seeks to assert a claim for promissory estoppel. (Doc. No. 16 at 7, n.5). Rather, Plaintiff's sole claim is for breach of the express contract created between the parties through the Offer Letter and its attachments and discussions leading up to that written agreement.

B.  The Complaint Alleges A Sufficiently Definite Promise to Create an Enforceable
Contract.

Defendant next argues that the facts in the Complaint are not "sufficiently definite" to establish an enforceable contract because (according to Defendant) they fail to specify "what precisely Plaintiff needed to do to be entitled to any commissions." (Doc. No. 13 at 9–10). But as Defendant concedes, the Complaint alleges that Defendant offered to pay Plaintiff "as much as a 15% commission on sales plus potential bonuses for making sales of DSCs[ ] . . . ." (Doc. No. 1 at ¶ 11). So, contrary to Defendant's assertion, it is clear from the Complaint that Plaintiff needed to "mak[e] sales of DSCs" in order to be entitled to commissions.[15]

Defendant, however, insists that these terms are not sufficiently definite to create an enforceable contract because the Complaint does not explain what constitutes "making sales of DSCs," and therefore the Court cannot possibly determine the circumstances under which commissions were earned by (and thus became due to) Plaintiff. (Doc. No. 13 at 10; Doc. No. 17 at 2).[16] The Court does not dispute Defendant's contention that to be enforceable, a contract must

---

[15] Defendant asserts also that the terms are not sufficiently definite with respect to the amount of the commission Defendant would owe Plaintiff for "making sales," because the Complaint "vaguely states that Plaintiff would be due '**as much as** 15% commissions on sales.'" (Doc. No. 13 at 10) (quoting Doc. No. 1 at ¶ 11). The Tennessee Supreme Court has observed, however, that "[c]ertainty with respect to promises does not have to be apparent from the promise itself, so long as the promise contains a reference to some document, transaction or other extrinsic facts from which its meaning may be made clear." *Doe v. HCA Health Servs. of Tenn., Inc*., 46 S.W.3d 191, 196 (Tenn. 2001) (quoting 1 Richard A. Lord, Williston on Contracts, § 4:27, at 593 (4th ed. 1990)). Here, the Commission Plan outlines the amount of commission that is due to Plaintiff for each sale depending on the sale amount. (*See* Doc. No. 13-1 at 8). Additionally, the Tennessee Supreme Court has indicated that some ambiguity in an amount owed (when an amount is in fact owed) does not make a contract unenforceable for indefiniteness. *See HCA Health Servs*., 46 S.W.3d at 196-97. Accordingly, the Court rejects Defendant's arguments that the contract is void for indefiniteness based on the (purported but actually nonexistent) vagueness or uncertainty as to the commission percentage allegedly owed to Plaintiff.

[16] Notably, Defendant does not concede that the (alleged) contract between the parties clearly specifies what Plaintiff must do in order to "mak[e a] sale[]" and then argue that the Complaint fails to allege facts sufficient to show that Plaintiff has done all that is required to meet that specific definition. Rather, Defendant appears to argue that there is no enforceable contract because an essential term of the agreement

include sufficiently definite terms to allow a reviewing court to ascertain the parties' respective obligations. *See Higgins v. Oil, Chem. & Atomic Workers Int'l Union, Loc. No. 3-677*, 811 S.W.2d 875, 880 (Tenn. 1991) (noting that a contract "must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties" (quoting *Soar v. National Football League Players' Ass'n*, 550 F.2d 1287, 1290 (1st Cir. 1977))); *Elk Valley*, 832 S.W.2d at 553–54 ("If the essential terms of an alleged agreement are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." (citing Restatement (2d) Contracts § 33 (1981))). Nor does the Court dispute that the term "making sales" is ambiguous in the sense that reasonable persons could disagree as to whether it applies in particular circumstances.[17] But the fact that reasonable persons could disagree about the meaning of a contractual term—and in particular the extent to which it applies in certain circumstances—does not make a contract unenforceable for indefiniteness. In *HCA Health Services*, the Tennessee Supreme Court quoted from a leading treatise on contract law for "authority concerning the requirement of definite contractual terms." 46 S.W.3d at 196–97. That treatise states that there will be no indefiniteness or uncertainty so as to prevent an agreement from being an enforceable contract based on the fact that a term of the agreement calls for payment of a "reasonable" price. *See id.* (quoting 1 Joseph M. Perillo, *Corbin on Contracts*, § 4.3, at 567–68 (Rev. ed. 1993)).

---

(i.e., what it means to "mak[e] sales of DSCs") is "so uncertain that there is no basis for deciding whether the agreement has been kept or broken." *People's Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553-54 (Tenn. Ct. App. 1991) (citing Restatement (2d) Contracts § 33 (1981)).

[17] In other circumstances, however, persons could not reasonably disagree as to whether the term applies. Suppose, for example, that a customer hands the hardware-store cashier bills and coins to cover the sticker price (plus tax) on a bottle of drain-clog remover, then takes the bottle home and dumps it out down a clogged drain, and never returns to that hardware store. In that case, the hardware store unambiguously "made a sale"; one cannot reasonably construe the term as inapplicable under these circumstances. But suppose instead that the customer walks into and out of the store empty-handed without ever engaging with anyone or anything, never to return. In that case the hardware store unambiguously did *not* make a sale; one cannot reasonably construe the term as applicable under these circumstances.

Reasonable persons certainly could disagree about what constitutes a "reasonable" price for any particular good or service. But that alone does not make the contract unenforceable for indefiniteness.

In this case, reasonable persons could disagree about whether a sale was "made" when Plaintiff completed various actions (such as building personal relationships, giving presentations, and partaking in negotiations) that ultimately caused the Albanian government to execute the agreement to purchase DSCs, or whether the sale was "made" only when the Albanian government executed the purchase agreement. But this ambiguity does not render the agreement "so uncertain that there is no basis for deciding whether the agreement has been kept or broken." *Elk Valley*, 832 S.W.2d at 553–54 (citing Restatement (2d) Contracts § 33 (1981)). This is simply not an instance in which an essential term (such as price) is completely absent from the agreement or so clearly

uncertain[18] that the Court questions whether there has been a meeting of minds.[19] Although additional information may be required to determine precisely what it means to "make a sale" within the meaning of the parties' agreement (and thereby earn Plaintiff a commission), the Court

---

[18] There are some instances in which an essential term to a contract is *so* ambiguous or indefinite that the contract cannot be enforced. However, the case law demonstrates that "making sales" simply does not rise to that level of uncertainty. In *Higgins*, 811 S.W.2d at 880-81, the Tennessee Supreme Court cited several examples of contracts that were unenforceable because they lacked definite terms, including where: (1) an employer assured an injured employee that the employer would "take care of him" and assign him "light work" once he was able to do it without any discussion of a specific job, pay, hours, or duration of employment (citing *Laseter v. Pet Dairy Products Co.*, 246 F.2d 747, 748 (4th Cir. 1957)); (2) a decedent made an oral statement that she would ensure in her will that the plaintiff "was taken care of" (citing *Cotton v. Roberts' Estate*, 337 S.W.2d 776 (Tenn. Ct. App. 1960)); (3) a promise was made to leave the plaintiff sufficient money to support her "in style to which [she] was accustomed," (citing *Scott v. Grinnell*, 161 A.2d 179 (1960)); and (4) a private secretary claiming that her employer promised to take care of her and her financial needs for life, (citing *Saunder v. Baryshnikov*, 487 N.Y.S.2d 51 (1985)).

The Complaint alleges contractual terms far more definite than those in the examples cited in *Higgins*. Specifically, the Complaint alleges (and the Court accepts as true, for purposes of the instant Motion) that Defendant offered Plaintiff a job as Defendant's "Senior Sales Manager," a role that would primarily involve developing and procuring a customer base for Defendant's new product, DSCs. (Doc. No. 1 at ¶ 8). As compensation for that job, Defendant offered Plaintiff a "relatively low base salary," as well as commissions of up to 15% (plus potential bonuses) for making sales of DSCs. (*Id*. at ¶ 11). The Offer Letter and attached Commission Plan further support those allegations. (Doc. No. 13-1). In the Offer Letter, Defendant sets forth the "terms and conditions" of its "offer of employment" to Plaintiff. (Doc. No. 13-1 at 4). Among those terms and conditions are ones concerning Plaintiff's compensation, which (according to the Offer Letter) included a "base salary" of $120,000 per year and "variable pay." (*Id*.). The "variable pay" refers to the attached Commission Plan, which is titled "Senior Sales Manager Compensation Structure." (*Id*. at 4, 8). The Commission Plan details the percentage of commission that Plaintiff may earn, which appears to be tiered (up to 15% for a single sale) based on the amount of the total sale. (*Id*. at 8). Additionally, the Complaint contains facts regarding the specific conduct in which Plaintiff engaged to make a sale of DSCs to the Albanian government. For example, Plaintiff organized and made visits to Albania, personally met with members of the Albanian government (up to and including the Prime Minister of Albania), developed personal relationships with Albanian government officials, presented Defendant's services to Albanian government officials, and was integral to negotiations of Defendant's contract with the Albanian government. (*Id*. at ¶¶ 15-20). The Complaint asserts also that Plaintiff was "heavily involved" in drafting the paperwork required to complete the deal and that once that paperwork was submitted to the Albanian government for execution "the job was effectively done, and [Plaintiff] had completed all work necessary to earn his commission on this deal." (Doc. No. 1 at ¶¶ 24-25).

[19] When referring to general principles of contract law—and specifically the formation of a valid contract—Tennessee courts frequently speak (metaphorically) in terms of whether there has been a "meeting of the minds" between the parties. *See, e.g., Sweeten v. Trade Envelopes, Inc*., 938 S.W.2d 383, 386 (Tenn. 1996) ("Under general principles of contract law, a contract 'must result from a meeting of the minds of the parties in mutual assent to the terms.'" (quoting *Higgins v. Oil, Chemical & Atomic Workers*, 811 S.W.2d 875, 879 (Tenn. 1991))); *Thompson v. Hensley*, 136 S.W.3d 925, 929 (Tenn. Ct. App. 2003) ("[A]n enforceable contract must result from a meeting of the minds in mutual assent to terms . . . ." (quoting *Klosterman Dev. Corp. v. Outlaw Aircraft Sales, Inc*., 102 S.W.3d 621, 635 (Tenn. Ct. App. 2002))).

is confident that a factfinder can resolve—based on additional information provided at later stages in this case—the question of whether Plaintiff in fact "made a sale" (to the Albanian government) as he alleges.

Additionally, Tennessee courts favor the "determination that an agreement is sufficiently definite." *APCO Amusement Co. v. Wilkins Family Rest. of Am., Inc*., 673 S.W.2d 523, 528 (Tenn. Ct. App. 1984) (quoting 17 Am. Jur. 2d Contracts § 75 (1964)). "Therefore, the courts will, if possible so construe the agreement as to carry into effect the reasonable intention of the parties, if that can be ascertained. The law leans against the destruction of contracts for uncertainty, particularly where one of the parties has performed his part of the contract." *Id*. (quoting 17 Am. Jur. 2d Contracts § 75 (1964)). Therefore, the Court concludes that the purported indefiniteness or uncertainty is not a basis to conclude that Plaintiff has not sufficiently alleged an enforceable contract.

C. The Complaint Adequately Alleges That Defendant Violated the Implied Covenant of Good Faith and Fair Dealing In a Manner That Supports His Breach-of-Contract Claim.

Defendant next argues that Plaintiff's allegation that Defendant breached its contract by failing to pay Plaintiff his "earned commission" is insufficient to establish the element of breach. (Doc. No. 13 at 10). Specifically, Defendant argues that even if there is an enforceable contract obligating Defendant to pay Plaintiff commissions for making sales of DSCs, the Complaint fails to allege that the contract required Defendant to pay Plaintiff commissions for sales that were completed only *after his termination*.[20] (*Id*. at 11).

Defendant's argument is premised on the assumption that Plaintiff did not actually "make a sale" (and thus, did not earn a commission) until the deal with the Albanian government was

---

[20] The Court equates "completed sales" with "ma[de] sales," and sees no reason to conclude that Defendant treats these phrases any differently.

finalized. Put another way, Defendant takes the position that the only event that "*could have* triggered an obligation to pay*" Plaintiff a commission was the closing (i.e., the signing) of the deal. (Doc. No. 13 at 11). But as explained above, reasonable minds might disagree about what Plaintiff must show to establish that he "made a sale" of DSCs. One plausible interpretation could be that Plaintiff "made a sale" (and thus became entitled to his commission) once he completed various undertakings (such as building personal relationships, making presentations, engaging in negotiations, and preparing paperwork necessary to memorialize the sale) that were sufficient to ultimately cause the Albanian government to purchase DSCs. Under this interpretation, Plaintiff has alleged facts sufficient to establish that Defendant breached the contract because the Complaint alleges that that Plaintiff took all of the steps necessary to "make a sale" [21] and thus earned his commission prior to his termination regardless of when the deal was executed. Defendant's failure to pay Plaintiff a commission on the sale (under this interpretation of "making sales"), therefore would constitute a breach of the contract.

Under what at this stage is an equally plausible interpretation of "making sales" (and the one that Defendant appears to embrace), Plaintiff could not be said to have "made a sale" (and thus did not earn a commission) until the Albanian government *executed the agreement* to purchase the DSCs. Under this interpretation, Plaintiff was terminated before the event that triggered an obligation for Defendant to pay Plaintiff his commission, and therefore (according to Defendant)

---

[21] The Complaint alleges that Plaintiff organized and made visits to Albania, personally met with members of the Albanian government (up to and including the Prime Minister of Albania), developed personal relationships with Albanian government officials, presented Defendant's services to Albanian government officials, and was integral to negotiations of Defendant's contract with the Albanian government. (*Id*. at ¶¶15-20). The Complaint asserts also that Plaintiff was "heavily involved" in drafting the paperwork required to complete the deal and that "all necessary documents to complete the deal were submitted and simply awaiting execution by the Albanian government" before he was terminated. (*Id*. at ¶ 24). Once those documents were submitted to the Albanian government for execution, "the job was effectively done, and [Plaintiff] had completed all work necessary to earn his commission on this deal." (*Id*. at ¶¶ 24-25).

Plaintiff cannot establish that Defendant breached the contract. But even under this interpretation, (i.e., even assuming arguendo that the sale was not "made" until the deal was signed (and thus, assuming that Plaintiff was fired before he earned his commission)), Plaintiff could establish that Defendant is liable for breaching the contract by showing (among other things) that Defendant violated the implied covenant of good faith and fair dealing.[22] As Defendant correctly notes, Tennessee courts have consistently found that a breach of the duty of good faith and fair dealing "is not a cause of action in and of itself." *Doe v. Univ. of S.*, No. 4:09-CV-62, 2011 WL 1258104, at *18 (E.D. Tenn. Mar. 31, 2011) (quoting *Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888, 894 (Tenn. Ct. App. 2000)). However, the duty of good faith and fair dealing is "a part of a breach of contract cause of action."[23] *Id*. Contrary to Defendant's assertion, Plaintiff does not assert Defendant's purported breach of the duty of good faith and fair dealing as an independent cause of action; rather, Plaintiff invokes the duty of good faith and fair dealing "as part of the larger breach of contract claim." (Doc. No. 16 at 7, n.5) (citing Doc. No. 1 at ¶ 35). As this Court has previously explained regarding the historically under-analyzed topic of how a breach of the implied covenant of good faith and fair dealing (at times referred to herein as the "implied covenant") can be of significance even if it is not itself a cognizable cause of action:

> While the implied covenant does not create new contractual rights or obligations, it protects the parties' reasonable expectations as well as their rights to receive the benefits of their agreement. Thus, "there is an implied covenant of good faith and fair dealing in every contract, whereby neither party shall do anything which will have the effect of destroying or injuring the right of the other party to

---

[22] Tennessee courts have routinely held that an implied covenant of good faith and fair dealing applies to every contract. *Dick Broad. Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. 2013).

[23] Below, the undersigned provides his view about how breach of the covenant of good faith and fair dealing comprises "a part" of a breach-of-contract claim: essentially, if the defendant is properly considered to have breached the covenant of good faith and fair dealing—meaning, in essence, engaging in bad faith and unfair actions that prevent the occurrence of circumstances whereby the plaintiff would get the benefit of his bargain—the defendant cannot raise the non-occurrence of such circumstances as a defense to the plaintiff's breach of contract claim.

receive the fruits of the contract." The general idea, at least in pertinent part, seems to be that one party cannot in bad faith get in the way of the counterparty's satisfaction of a contract condition that would result in the counterparty's realization of a benefit under the contract. In the Court's view, the following hypothetical demonstrates the principle. If a landowner agrees to pay a painter a $10,000 commission if she completes a "satisfactory" landscape of the landowner's estate, the landowner breaches the covenant of good faith and fair dealing—and thus the contract—if he stops allowing the painter onto his estate after the painter has completed most of the painting; the covenant protects the painter from the argument that she, not having "completed" a "satisfactory" landscape, is contractually not entitled to a commission.

*Walton v. Interstate Warehousing, Inc.*, No. 3:17-CV-1324, 2020 WL 1640440, at *9 (M.D. Tenn. Apr. 2, 2020) (citations omitted). The undersigned has further explained:

The general idea appears to be that if the defendant, through acts evidencing bad faith or unfair dealing (or at least the absence of good faith and fair dealing), prevents the occurrence of circumstances whereby the plaintiff would become entitled to receive from the defendant the contractual benefits for which the plaintiff bargained, the defendant must provide those benefits to the plaintiff despite the non-occurrence of those circumstances; if the defendant fails to do so, then the defendant is liable for breach. In such circumstances, therefore, showing breach of the implied covenant of good faith and fair dealing is a vital part of the defendant establishing the breach of contract even though breach of the implied covenant of good faith and fair dealing is not itself the actionable breach of contract.

With this understanding of the proper role and applicability of the breach of the implied covenant of good faith and fair dealing, the Court next asks what exactly Defendants allegedly did here to interfere with Plaintiff's right to receive the benefits of his implied contract with Defendants? To implicate the covenant of good faith and fair dealing in any sense that adds anything to his breach of contract claim not already present based on the terms of the implied contract, Plaintiff must identify something Defendants have done (beyond breaching one or more terms of the implied contract itself) that gets in the way of Plaintiff achieving—of circumstances reaching the point where Plaintiff has—the right to receive benefits under that contract.

*Evans v. Vanderbilt Univ. Sch. of Med.*, 589 F.Supp.3d 870, 900-01 (M.D. Tenn. Mar. 4, 2022).

Over the course of several months, Plaintiff made efforts to secure the sale of DSCs to the Albanian government. (*See* Doc. No. 1 at ¶¶ 15–20.) After drafting and submitting to the Albanian government for execution the paperwork required to complete the deal, "the job was effectively

done, and [Plaintiff] had completed all work necessary to earn his commission on this deal." (*Id*. at ¶¶ 24–25). Despite these efforts, Defendant terminated Plaintiff "mere months before the deal officially closed" in order "to avoid paying him his hard-earned commission on th[e] deal." (Doc. No. 1 at ¶¶ 25–26). By terminating Plaintiff's employment for no reason other than to avoid paying Plaintiff commission on the deal with the Albanian government, Defendant prevented Plaintiff from achieving the right to receive benefits (commission for the deal) under his contract. The implied covenant—if indeed applicable here, as Plaintiff plausibly alleges—therefore precludes Defendant from raising, as a defense to the Plaintiff's breach-of-contract claim, the fact that the deal was signed only after Plaintiff was terminated. Based on Plaintiff's allegations, the instant case is the all-too-rare one where the plaintiff has both plausibly alleged a breach of the implied covenant and suggested the appropriate consequential effect of such a breach. Accordingly, the Court rejects Defendant's argument that the Complaint has not alleged facts to establish the element of breach.

D. The Offer Letter's Disclaimer Does Not Unambiguously Foreclose All Claims for Breach of Contract

Finally, Defendant argues that Plaintiff's breach-of-contract claim fails because the Offer Letter contains a disclaimer stating that it "does not constitute an employment contract." (Doc. No. 13 at 15). Additionally, noting that the Offer Letter expressly states that Plaintiff's compensation could be changed at any time for any or no reason, with or without notice, Defendant argues that Plaintiff "did not have a contractual right to any particular . . . compensation . . . ." (*Id*.). In essence, Defendant argues that there was no enforceable promise to pay Plaintiff any particular compensation, including commissions like the one he now claims to be owed.

The disclaimer contained in the Offer Letter ("Disclaimer") states as follows:

While this letter does not constitute an employment contract, we are very pleased to have you join Satellogic USA, Inc. and look forward to a mutually rewarding working relationship. Your employment with the Company is at will. This means that your terms and conditions of employment, including but not limited to termination, demotion, promotion, transfer, compensation, benefits, duties and location status as an at-will employee may be changed with or without cause, for any or no reason, and with or without notice. Your status as an at-will employee cannot be changed by any statement, promise, policy, course of conduct, writing or manual unless except [sic] through a written agreement signed by the Chief Executive Officer of the Company.

(Doc. No. 13-1 at 5). Plaintiff argues that the Disclaimer disclaims only the existence of an employment contract for a specific duration so as to establish merely that the employment was at will. (Doc. No. 15 at 8). The Disclaimer does not (according to Plaintiff) additionally disclaim the existence of other kinds of contracts and thus fails to support the notion that the parties did not enter into some other kind of contract (such as a contract for at-will employment that included an agreement for Plaintiff to be paid a commission under certain circumstances). (*Id*). On the other hand, Defendant argues that the Disclaimer is broad enough to disclaim the existence of *any* contractual agreement, i.e., a contractual agreement about anything whatsoever (such as the payment of a commission under certain circumstances). (Doc. No. 13 at 15). Defendant relies on several cases that it contends support this proposition, but Defendant's reliance on those cases is misplaced for two reasons.

First, all of the cases on which Defendant relies relate to whether an employee handbook is sufficient to create an enforceable contract. True, "Tennessee law is clear that a handbook will not give rise to contractual obligations on the part of the employer where it includes a disclaimer stating that the handbook is not a contract, or should not be construed as a contract." *Shell v. J.J.B. Hilliard*, No. 3:05-CV-245, 2007 WL 2220411, at *5 (E.D. Tenn. July 27, 2007) (citing *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 688 (Tenn. App. 1999)). But Defendant points to no case law supporting the notion that Tennessee courts have extended that rule to the kind of document

here at issue, which the Court will call an "offer letter." This distinction is significant because an offer letter generally includes language creating an express contract through a clearly stated offer and invitation for acceptance—the things that axiomatically (together with consideration) generally suffice to create a contract. This is true in the case of the Offer Letter, which after all referred to itself as an "employment offer" and stated that it "confirm[ed] the terms and conditions of [Defendant's] offer of employment," and directed Plaintiff "[t]o indicate [his] acceptance of the offer" by signing the Offer Letter and returning it with a message stating "I accept." (Doc. No. 13-1 at 5). An employee handbook, by contrast, generally lacks such straightforward evidence of mutual assent and will therefore give rise only to an implied contract, if any contract at all.

Second, three of the four cases cited by Defendant concern whether disclaimers contained in employee handbooks were sufficient to prevent the employee handbooks from creating a contract guaranteeing continued employment *for a specified term*, as opposed to creating merely an at-will employment relationship (that conceivably could involve binding promises regarding, for example, the compensation to be paid to the employee for work done during whatever period the employee happens to be employed). *See Keller v. City of Cleveland, Tenn.*, No. 1:13-CV-91, 2014 WL 2809662, at *6 (E.D. Tenn. June 20, 2014) ("[B]ecause [the plaintiff] can point to nothing in the record that creates a definite term of employment, he has not rebutted the presumption of at-will employment") (internal citations omitted); *McCarthy v. UT–Battle, LLC*, No. E2003–02052–COA–R3–CV, 2004 WL 350665, at *1 (Tenn. Ct. App. Feb. 25, 2004) (holding a disclaimer effective where it stated "ORNL retains the right to change, modify, suspend, interpret, or cancel in whole or in part any of its published or unpublished policies or practices, without advance notice, in its sole discretion, without having to give cause or justification to any employee . . . . Nothing contained in this handbook should be construed as a guarantee of continued

employment, but rather, employment at ORNL is on an at-will basis"). Therefore, these cases simply do not address whether a disclaimer is sufficient to avoid the creation of *other* kinds of contracts, and thus they do not support the notion that the Disclaimer is sufficient to foreclose the creation of *any* contract (including the kind of contract Plaintiff alleges to have been breached). Moreover, Defendant has not pointed to any other authority indicating that language of the kind found in the Disclaimer is sufficient to foreclose the creation of any contract (including a contract of the kind Plaintiff alleges to have been breached).

Additionally, the Disclaimer is ambiguous as to what exactly it purports to disclaim. Under Tennessee law, "a contract is ambiguous if the disputed language is susceptible to more than one reasonable interpretation." *Nat'l Fitness Ctr., Inc. v. Atlanta Fitness, Inc*., 902 F. Supp. 2d 1098, 1105 (E.D. Tenn. 2012) (citing *Maggart v. Almany Realtors, Inc*., 259 S.W.3d 700, 704 (Tenn. 2008)). Whether contractual language is ambiguous is a question of law to be decided by the court. *Burka v. Vanderbilt Univ. Med. Ctr*., 550 F. Supp. 3d 530, 541 (M.D. Tenn. 2021) (citing *Stonebridge Life Ins. Co. v. Horne*, No. W2012-00515-COA-R3-CV, 2012 WL 5870386, at *4–*5 (Tenn. Ct. App. Nov. 21, 2012)).[24]

"When a contract's terms are ambiguous . . . interpretation is a question of fact and is not appropriately decided in the context of Rule 12." *McKee Foods Corp. v. Pitney Bowes, Inc.*, No.

---

[24] The Court realizes that the concept of ambiguity can be subjective, in that there is a continuum between what can be called "ambiguous" and what can be called "unambiguous," and in many cases there can be reasonable disagreement about where on the continuum the possibly ambiguous item (such as, in this case, a contract term) falls. That is why, for example, in *Planters Gin Co*. *v. Fed. Compress & Warehouse Co.*, the learned jurists on the Tennessee Supreme Court came to the opposite conclusion regarding ambiguity than had the learned jurists of the Tennessee Court of Appeals. 78 S.W.3d 885 (Tenn. 2002). All of which is to say that sometimes ambiguity is in the eye of the beholder. Be that as it may, it is the Court's job to call it like it sees it, giving a yes/no answer to the question of whether the contact is ambiguous. The Court must call the contract unambiguous on the issue in question if it concludes that the meaning of the primary provision bearing on that issue is "inescapable," especially when considered in conjunction with any secondarily applicable provisions. *See Planters Gin Co*., 78 S.W.3d at 891 ("We, however, find no ambiguity in the contract at bar. ... The meaning of [the primarily applicable] provision is inescapable, particularly given the language [that follows it].").

1:06-CV-80, 2007 WL 896153, at *3 (E.D. Tenn. Mar. 22, 2007); *see also Ajuba Int'l, L.L.C. v.*
*Saharia*, 871 F. Supp. 2d 671, 689 (E.D. Mich. 2012) ("In reviewing a Rule 12(b)(6) motion to
dismiss, the Court may resolve issues of contract interpretation when the contract is properly
before the Court, but must resolve all ambiguities in the contract in Plaintiffs' favor. A contract is
ambiguous if its words may reasonably be understood in different ways. A court should not choose
between reasonable interpretations of ambiguous contract provisions when considering a motion
to dismiss under Rule 12(b)(6). In other words, the construction of ambiguous contract provisions
is a factual determination that precludes dismissal on a motion for failure to state a claim." (cleaned
up)).

Notably, when deciding the issue of ambiguity, a court must construe a contract as a whole.
As the undersigned has previously stated:

> Parts of some judicial opinions speak as if the court's initial task in contract
> construction is to determine whether a *particular provision* in the contract is
> ambiguous. *Planters Gin Co.*, 78 S.W.3d at 890 ("[A] contractual provision may
> be susceptible to more than one reasonable interpretation, which renders the terms
> of the contract ambiguous."). But this is inexact. Properly understood, contractual
> interpretation is not about interpreting particular contractual provisions in isolation,
> but rather about construing the contract *as a whole*. "The proper construction of a
> contractual document is not dependent on ... any single provision of it, but upon the
> entire body of the contract and the legal effect of it as a whole. The whole contract
> must be considered in determining the meaning of any or all of its parts." *Aetna
> Cas. & Surety Co. v. Woods*, 565 S.W.2d 861, 864 (Tenn. 1978) (citation omitted).
> Of course, the "meaning" of the contract to be determined is its meaning with
> respect to the particular issue confronting the Court, and it is important for the court
> to understand and articulate that issue when undertaking contract construction.

*Thornton v. Dutch Nats. Processing, LLC*, 629 F. Supp. 3d 777, 789 (M.D. Tenn. 2022).

Here, the question is whether the Offer Letter (particularly but exclusively in light of the
Disclaimer) *unambiguously* forecloses the existence of a contractual agreement. Construing the

Offer letter as a whole as it must, the Court finds that it does not.[25] The Offer Letter states that Plaintiff's "terms and conditions of employment, including . . . compensation . . . may be changed with or without cause, for any or no reason, and with or without notice." This language (viewed in isolation) certainly supports Defendant's argument that the Offer Letter should not be construed as making any enforceable promises at all (including the kind of alleged promise regarding commissions that Plaintiff contends was broken by Defendant). But as noted above, "contractual interpretation is not about interpreting particular contractual provisions in isolation, but rather about construing the contract *as a whole*." *Thornton*, 629 F. Supp. 3d at 789. Other parts of the Offer Letter create uncertainty as to whether Defendant intended to be bound to the terms and conditions set forth in the Offer Letter. For example, the Offer Letter refers to itself as an "employment offer" and states that it "confirm[s] the terms and conditions of [Defendant's] offer of employment," and directed Plaintiff "[t]o indicate [his] acceptance of the offer" by signing the Offer Letter and returning it with a message stating "I accept." (Doc. No. 13-1 at 5). These statements clearly indicate intent by Defendant to enter into *some* kind of contract (even if not an "employment" contract guaranteeing Plaintiff a contractual right to the terms and conditions contained in the Offer Letter for any specific duration). Additionally, the Offer Letter states that it "does not constitute an *employment* contract," rather than stating more broadly that it does not constitute "a contract." (Doc. No. 13-1 at 5).

Considering the Disclaimer in light of these statements (which indicate an intent to enter into *some* contract), the Court finds the effect of the Disclaimer is unclear. Though the Disclaimer could be read as indicating that Defendant had no intent to be bound by any of the terms and

---

[25] To be clear, the Court concludes that the Offer Letter, construed as a whole, does not unambiguously foreclose the existence of any contractual agreement whatsoever. The Court makes no determination as to whether or not the Offer Letter disclaims the existence of any contractual agreement. Rather, the Court simply concludes that the Offer Letter does not do so *unambiguously*.

conditions set forth in the Offer Letter, it could just as easily be read as an offer to pay Plaintiff (as an at-will employee) commissions for making sales of DSCs, albeit for an indefinite period of time.[26] Because the Offer Letter is reasonably susceptible to each of these competing interpretations, the Court cannot conclude that the Offer Letter unambiguously forecloses the existence of a contract of the kind that Plaintiff alleges (i.e., a contract for at-will employment that included an agreement for Plaintiff to be paid a commission under certain circumstances). Accordingly, interpretation of the ambiguous Offer Letter is a question of fact that is not appropriately decided in the context of Rule 12. The Court therefore cannot dismiss Plaintiff's breach-of-contract claim on the grounds that the Offer Letter disclaimed the existence of a contract of the kind Plaintiff alleges.

<u>CONCLUSION</u>

Defendant's arguments for dismissal pursuant to Rule 12(b)(6) are certainly not frivolous, but they ultimately are unpersuasive. For the reasons stated herein, the Motion at Doc. No. 13 will be DENIED.

An appropriate corresponding order will be entered.

IT IS SO ORDERED.


*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[26] Tennessee courts have acknowledged that although at-will employees (by definition) have no contractual right to "continued, indefinite employment," "they may have other contract rights and expectations, such as the right and expectation to be paid the agreed-upon wage . . . ." *Goot v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M200302013COAR3CV, 2005 WL 3031638, at *8 (Tenn. Ct. App. Nov. 9, 2005).